Appeal quashed.

685 A.2d 185

**In re J.M.**

**Appeal of J.M.**

Superior Court of Pennsylvania.

Submitted July 8, 1996.

Filed Nov. 14, 1996.

Etta M. Warman, Uniontown, for appellant.

Joseph E. Ferens, Jr., Uniontown, for Fayette County, participating party.

Before HUDOCK, SCHILLER, and MONTEMURO*, JJ.

SCHILLER, Judge.

Appellant appeals from an order of the Court of Common Pleas of Fayette County denying her challenge to an order for involuntary treatment. We reverse.

FACTS:

On January 11, 1996, Patrick Morrison, acting on behalf of the Fayette County Mental Health Administration,[1] visited appellant's house, along with a Uniontown police officer, in response to reports he had received, in part from appellant's sister who lived in Connecticut, concerning the appellant's mental well-being. Appellant would not allow Morrison or the officer into her home. Morrison then left the premises and obtained a warrant to take appellant into custody for emergency medical treatment, as provided by 50 P.S. § 7302 of the Mental Health Procedures Act.[2] Accompanied by two Uniontown police officers, Mr. Morrison returned to appellant's home. Again, appellant would not let them into her home. A 45 minute discussion ensued through the appellant's closed door, during which time appellant was talking on the telephone with her sister from Connecticut. One of the officers present at the house testified that he received information from his dispatch that they had received a telephone call from appellant's sister to the effect that appellant was threatening

---

* Retired Justice assigned to the Superior Court.

1. Morrison was the supervisor of the Emergency Services Unit of Chestnut Ridge Counseling Services in Uniontown. This was the office delegated by the Fayette County Mental Health Administration to handle emergency services.

2. Act of July 9, 1976, P.L. 817, No. 143, § 101.

to harm herself and her adult son, who resided with her. The officers then forcibly entered the house and found appellant pointing a loaded gun at them. With the help of appellant's son, the officers disarmed the appellant and took her into custody.[3] Appellant was taken into custody pursuant to 50 P.S. § 7302, which allows treatment up to 120 hours.

Upon being taken into custody, the appellant was examined by Dr. Cesar Noche at Uniontown Hospital, who determined that she needed mental health treatment. Appellant was then transferred to Highlands Hospital, where Dr. Joel Last diagnosed her as suffering from a delusional disorder and ordered emergency treatment. A few days later, a petition for extended treatment was made, pursuant to 50 P.S. § 7303. A hearing was held before Herbert G. Mitchell, the Fayette County Mental Health Review Officer. Mr. Mitchell found that appellant was severely mentally disabled, and ordered further treatment, not to exceed the twenty days allowed by the statute.

Approximately two weeks later, the hospital sought a further extension for emergency treatment, and filed a petition for extended treatment under 50 P.S. § 7304, which allows for treatment up to 90 days. On February 2, 1996, a hearing was again held before Mr. Mitchell, at which time he recommended that appellant be confined at Torrance State Hospital. On February 6, 1996, the Court of Common Pleas of Fayette County, per the Honorable Gerald R. Solomon, entered an order for involuntary treatment at Torrance State Hospital. This order was entered without a hearing, and was based on the recommendation of the review officer. Appellant then filed a petition for review of this order. On February 8, 1996, the trial court held a hearing, at the close of which the court denied appellant's petition for review. This appeal followed.

DISCUSSION:

Appellant raises two issues for review: (1) whether the preparation and service of the warrant for emergency exami-

---

**3.** Appellant denied that the warrant was served, that the officers and Mr. Morrison were outside her door for 45 minutes, or that she threatened to cause anyone harm.

nation violated appellant's right to procedural due process; and (2) whether the evidence at the petition for review hearing was sufficient to justify the 90 day treatment order.

At issue in this case are several sections of the Mental Health Procedures Act [MHPA]. Sections 7301–7306 of the MHPA provide for the involuntary commitment of those persons who are "severely mentally disabled."

Section 7302(a) provides for the emergency examination of an individual upon a warrant issued by the county administrator:

> Warrant for Emergency Examination.—Upon written application by a physician or other responsible party setting forth facts constituting reasonable grounds to believe that a person is severely mentally disabled and in need of immediate treatment, the county administrator may issue a warrant requiring a person authorized by him, or any peace officer, to take such person to the facility specified in the warrant.

50 P.S. § 7302(a)(1).

Section 7301(a) states that a person is "severely mentally disabled"

> when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.

50 P.S. § 7301(a). The statute then defines in some detail what is meant by "clear and present danger."[4]

■ Appellant first argues that the warrant secured by Mr. Morrison was defective in that it did not allege sufficient grounds to take appellant into custody.

---

**4.** Clear and present danger to others shall be shown by establishing that within the past 30 days the person has inflicted or attempted to inflict serious bodily harm on another and that there is a reasonable probability that such conduct will be repeated ... For the purpose of this section, a clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm.

The warrant was obtained by Patrick Morrison of the county health offices. He completed the warrant and had it approved by the county administrator at approximately 5:30 P.M. on January 11, 1996. The warrant was based on two sources of information: unsworn reports Mr. Morrison had received concerning the appellant's mental well-being, coming from appellant's sister in Connecticut, and his observations of the appellant when he first visited her house at approximately 3:00 P.M. on January 11, 1996. The warrant stated:

[Appellant] has made many calls to law enforcement agencies, i.e. FBI, City Police, Attorney General's office, Pgh [Pittsburgh] rape hotline and many others. She is very delusional in that she feels that she is a federally protected witness. She is very paranoid and guarded. She would not allow us in the home. She was disheveled with a contusion to her right eye. She said that she would speak only to the FBI. At this time she is clearly unable to care for herself. **She would benefit from inpatient care.**

Warrant, MHPA § 302 [50 P.S. § 7302] (emphasis added).

There is little in the statute or in the case law that offer assistance in our consideration of whether reasonable grounds

Clear and present danger to himself shall be shown by establishing that within the past 30 days:

(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision, and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or

(ii) the person has attempted suicide and that there is the reasonable probability of suicide unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; or

(iii) the person has substantially mutilated himself or attempted to mutilate himself substantially and that there is the reasonable probability of mutilation unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.

50 P.S. § 7301(b).

were alleged in this warrant. The one case we have found involving such a warrant, *Uram v. County of Allegheny*, 130 Pa.Cmwlth. 148, 567 A.2d 753 (1989), provides little guidance on the standards governing warrants, and is clearly a different case on the facts.[5] As a result, we must turn to criminal procedure to examine how arrest warrants, the closest analogy to the warrant under the MHPA, are reviewed.

In order to be valid, an arrest warrant must show probable cause for the arrest. Pa.R.Crim.P. 119(a). In considering whether an arrest warrant satisfies the requirement of probable cause, Pennsylvania Courts use the totality of the circumstances approached formulated by the United States Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). *See Commonwealth v. Rogers*, 419 Pa.Super. 122, 137, 615 A.2d 55, 62 (1992). Only the information within the four corners of the warrant may be examined in determining whether the warrant was sufficient. *Id.; Commonwealth v. Edmunds*, 526 Pa. 374, 382, 586 A.2d 887, 891 (1991); *see also Commonwealth v. Weidenmoyer*, 518 Pa. 2, 8, 539 A.2d 1291, 1294 (1988) (same rule for search warrants).

In this case, Mr. Morrison testified that he never checked with the FBI to see if the appellant was a protected witness or if she had ever had dealings with the FBI. Nor did he claim to have any personal knowledge that appellant made the calls to the law enforcement agencies. His statement that she was very "paranoid and guarded" is actually a medical conclusion that he was not qualified to make.[6]

---

5. In *Uram*, the health office received a telephone call from a person who admitted feeling suicidal and had taken pills towards committing suicide only two days before the call.

6. The term "paranoid," although often used by lay people, is actually a medical diagnosis of a personality disorder, the essential feature of which "is a pattern of pervasive distrust and suspiciousness of others such that their motives are interpreted as malevolent." One of the characteristics of this illness is that individuals with this disorder "are reluctant to confide in or become close to others because they fear that the information they share will be used against them." *Diagnostic and Statistical Manual of Mental Disorders* (American Psychiatric Association, 4th ed. 1994), § 301, p. 634.

In addition, at no time in making his investigation did Mr. Morrison attempt to talk to appellant's son, daughter or brother, all of whom lived in the same area as appellant.[7] Instead, he relied on the statements of appellant's sister, who lived in Connecticut and who, according to appellant's daughter, had a serious conflict with the appellant.[8]

In the criminal context, our courts have held that the police must show some specific facts that would give them a substantial basis for believing the information supplied by an informant.[9] *Commonwealth v. Stokes*, 480 Pa. 38, 44, 389 A.2d 74, 76 (1978). This requirement exists to insure that the information that the police rely on was actually witnessed by the informant and is not merely an unsubstantiated rumor or a well-constructed fabrication. *Id.*, at 45, 389 A.2d at 77. Certainly, those same concerns are present in the mental health context. Mr. Morrison had no prior contacts with appellant's sister, was not aware of appellant's relationship with her sister, and did not have any knowledge of her veracity. As such, Mr. Morrison had no basis to believe that the sister was reliable and her statements trustworthy.

Finally, our statute clearly provides that for involuntary mental commitment, one must be severely mentally disabled such that one is a **clear and present danger** to himself or others.[10] While Mr. Morrison's personal observations led him

---

**7.** At the hearing before the court of common pleas, appellant's daughter and brother testified that appellant had never acted violently, abusive or suicidal. N.T., February 8, 1996, at 97 (daughter); 101 (brother).

**8.** N.T., February 8, 1996, 99. Appellant's brother was not allowed to testify about his knowledge of this conflict between his two sisters, on the grounds that such testimony would be hearsay.

**9.** Such information is often used in arrests and searches, both with and without a warrant.

**10.** This requirement follows from the holding of the United States Supreme Court in *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975):

A finding of "mental illness" alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that the term can be given a reasonably precise content and that the "mentally ill" can be identified with reasonable accuracy, there is still no constitutional basis for

to conclude that appellant was delusional, he did not state that she represented a clear and present danger to others or to herself, and there was no evidence of any overt act showing such a danger, as required by the statute.

The county argues that when the facts concerning the second visit to appellant's home are included, the warrant was sufficient. This argument is grounded in the fact that after he had taken appellant into the hospital, Mr. Morrison amended the warrant to include the following: "When serving 302, [appellant] threatened to shoot herself and her 23 year old son and, in fact, pointed a loaded automatic pistol at police and MH delegate. She is clearly a danger to herself and others." The lower court considered this amendment in declaring the warrant valid.

As above, we turn to our criminal procedure requirements regarding arrest warrants for guidance on this issue. Pennsylvania Rule of Criminal Procedure 119 provides for the issuance of arrest warrants upon a showing of probable cause. The rule holds that when faced with a motion challenging an arrest warrant, no evidence other than the affidavits sworn to before the issuing authority may be considered in determining if probable cause existed. Pa.R.Crim.P. 119(b); *see also Commonwealth v. Rogers, supra; Commonwealth v. Edmunds, supra.*

By analogy to these criminal rules, we cannot consider the amendment to the warrant in determining if the warrant, at the time it was issued, contained reasonable grounds that appellant was severely mentally disabled. This amendment was tacked onto the warrant but was not considered by the county administrator in issuing the warrant. Section 7302 is clear that the county administrator may issue a warrant only when reasonable grounds to commit the person are alleged before that administrator. Therefore, on review, what must be examined is the state of the warrant at the time it was

confining such persons involuntarily if they are dangerous to no one and can live safely in freedom.
*Id.,* at 575, 95 S.Ct. at 2493–94.

approved by the county administrator. As a result, the amendment cannot rehabilitate the warrant.

█ We note, however, that there does exist in the statute a provision that allows for commitment without a warrant, and, as the warrant here was insufficient, we may look to see if the county satisfied the requirements of a warrantless commitment. In this regard the applicable statutory section provides:

Emergency Examination Without a Warrant.—Upon personal observation of the conduct of a person constituting reasonable grounds to believe that he is severely mentally disabled and in need of immediate treatment, and [sic] physician or peace officer, or anyone authorized by the county administrator may take such person to an approved facility for an emergency examination. Upon arrival, he shall make a written statement setting forth the grounds for believing the person to be in need of such examination.

50 P.S. § 7302(a)(2).

We have found no case law defining what is sufficient to satisfy the requirement of a "written statement setting forth the grounds for believing the person is in need of immediate medical treatment." However, it is apparent to us that the purpose of this statutory mandate is to permit some appellate review of the propriety of the County's actions.

In this case, the only additional "written statement" were the two sentences discussed above, to wit: "When serving 302, [appellant] threatened to shoot herself and her 23 year old son and, in fact, pointed a loaded automatic pistol at police and MH delegate. She is clearly a danger to herself and others." There is no description of the circumstances surrounding the incident, nor the source of the information. Based on our review of the record, it is clear that (1) the gun was pointed by appellant only after the officers kicked in her front door, (2) the officers kicked in the door based on information received from appellant's sister, the truth of which they did not verify,[11]

11. As discussed above, there was no evidence presented by Mr. Morrison that appellant's sister was a reliable informant. In fact, there was

and (3) that Mr. Morrison and the officers were at appellant's house trying to serve a section 7302 warrant. The perfunctory addition of two sentences to the warrant, a warrant which we have since found to be defective, does not provide any context for the county's actions, and is clearly insufficient to satisfy the statutory requirement of a "written statement."

Thus, the warrant when issued did not state sufficient grounds to take appellant into custody, the amendment to the warrant could not be considered in determining the sufficiency of the warrant, and the county did not satisfy the requirements of taking appellant for examination without a warrant. As a result, appellant's original commitment was improper due to the county's failure to satisfy the required statutory procedures.

■ Although our resolution of appellant's first issue arguably renders a discussion of the second issue unnecessary, we are compelled to address the second issue because of the seriousness of the issue and the likelihood that it may arise again. *See Ellis v. Chicago Bridge & Iron Co.*, 376 Pa.Super. 220, 236–37, 545 A.2d 906, 914–15 n. 16 (1988). This issue concerns whether appellant's due process rights were violated because no records of the hearings before the mental health review officer were produced.

Section 7303 of the MHPA provides for extended involuntary emergency treatment for those persons who are already receiving emergency involuntary treatment if the treating facility determines that the patient requires treatment beyond the 120 hours provided by section 7302. Emergency involuntary treatment under section 7303 may run for 20 days. Under section 7303, a hearing before a judge or a mental health review officer must be conducted, at which time any relevant information related to whether the person is severely mentally disabled and in need of treatment may be heard. Section 7303(c)(2) provides: "A record of the proceedings which need not be a stenographic record shall be made. Such

evidence received that the sister and appellant were antagonistic toward each other.

record shall be kept by the court or mental health review officer for at least one year." 50 P.S. § 7303(c)(2). If further treatment is necessary, the judge or mental health review officer must prepare a certification containing the findings as to the reasons for treatment, and a description of the treatment being ordered. If the hearing was held before a mental health review officer, the subject of the hearing has the right to petition the court of common pleas for review.

Section 7304 provides for court-ordered involuntary treatment not to exceed ninety days. A person already subject to treatment under section 7303 may be ordered for treatment beyond twenty days under this section if a petition is filed. A hearing must be conducted by either a judge or a mental health review officer. As with the section 7303 determination, if the hearing is held before a mental health review officer, the person has the right to petition the court of common pleas for review.[12]

In this case, the mental health review officer held a hearing on the section 7303 petition (commitment up to 20 days) on January 16, 1996, and ordered that appellant receive further medical treatment. No record was produced of this hearing.[13] Although appellant did not file a petition for review of this order to the court of common pleas, a petition for further confinement (up to 90 days) was made under section 7034 prior to the expiration of her appeal period. On this second petition, the mental health review officer conducted a hearing on February 2, 1996, and recommended that additional treatment be ordered. Once again, no record was produced of this hearing.[14] Acting upon this recommendation, and considering the findings of fact and conclusions of law made by the mental health review officer, the trial court ordered appellant to

12. This right to petition the Court of Common Pleas for review of the mental health review officer's determination is also provided in 50 P.S. § 7109(b).

13. The only evidence in the record from the lower court of this action was the certification required by 50 P.S. § 7303(d) completed by the mental health review officer.

14. The record from below only includes the findings of fact and conclusions of law made by the mental health review officer.

undergo medical treatment for an additional ninety days, without having held a hearing. It was only when the appellant filed a petition for review with the trial court that a judicial hearing was conducted, and the record of that hearing was preserved.

The serious nature of the proceedings under the MHPA raise significant constitutional concerns. We have held that "there is no question that the substantial deprivation of individual liberty inherent in such [involuntary] commitments may only be accomplished in accordance with due process standards." *Commonwealth v. C.B.*, 307 Pa.Super. 176, 182, 452 A.2d 1372, 1375 (1982). These due process concerns are clear from the language of the statute: "[t]he provisions of this act shall be interpreted in conformity with the principles of due process." 50 P.S. § 7102. As our Supreme Court stated:

> The legislative policy reflected in the Mental Health Procedures Act is to require that strict conditions be satisfied before a court order for commitment be issued. This policy may occasionally result in the release of persons who **may** be mentally ill. Yet the statutory provision in question authorizes involuntary treatment only for those who **are** mentally ill. Such a policy is in accord with the recognition that commitment entails a massive deprivation of liberty. Collateral consequences, too, may result from the stigma of having been adjudged mentally ill ... Indeed, a person who is mistakenly committed to a mental hospital might suffer serious psychological damage. For those reasons, strict adherence to the statutory requirements is to be compelled.

*Commonwealth v. Hubert*, 494 Pa. 148, 153, 430 A.2d 1160, 1162–63 (1981).

It is obvious that the strict procedural requirements of the MHPA were not satisfied in this case. Section 7303(c)(2) requires that a record be made of a hearing conducted pursuant to 50 P.S. § 7303 (the 20 day commitment). Here, the mental health review officer conducted a section 7303 hearing, but no record was made. In addition, no record was ever made of the section 7304 hearing (the 90 day commitment). We have held that section 7304 requires that a record be

made, and that the person being treated have access to whatever record is made in order to satisfy due process. *In re S.O.*, 342 Pa.Super. 215, 231, 492 A.2d 727, 735 (1985).

The absence of a record of the hearings before the mental health review officer makes appellate review impossible; [15] as the Supreme Court has recognized: "[M]eaningful review is impossible where the reviewing court does not have available to it all of the facts considered in reaching the judgment." *Soja v. Pennsylvania State Police*, 500 Pa. 188, 195, 455 A.2d 613, 616 (1982) (citing *U.S. ex rel. Kinney v. U.S. Fidelity & Guaranty Co.*, 222 U.S. 283, 32 S.Ct. 101, 56 L.Ed. 200 (1911), and *Guthrie v. Wilson*, 40 Pa. 430 (1861)).[16]

In this case, the trial court ordered the section 7304 90 day treatment solely on the basis of the review officer's recommendations.[17] The trial court did not conduct a hearing on this petition, nor does it appear that the court had before it a record of the February 2nd hearing before the mental health review officer.[18] As there was also no record of the January 16th hearing, it violated appellant's due process rights for the

**15.** *See Commonwealth ex rel. Platt v. Platt*, 266 Pa.Super. 276, 292, 404 A.2d 410, 418 (1979)(remand to trial court because transcript of the hearing before the mental health review officer was inaudible).

**16.** *See also Monaghan v. Board of School Directors*, 152 Pa.Cmwlth. 348, 353, 618 A.2d 1239, 1241–42 (1992):

The crucial aspect on appeal is whether there is a complete and accurate record of the testimony taken so that the appellant is given a base upon which he may appeal, and also, that the appellate court is given a sufficient record upon which to rule on questions presented. (citation omitted).

**17.** We have held that when a mental health review officer acts under a section 7304 petition, he is acting like a trial master. *In re Chambers*, 282 Pa.Super. 327, 331, 422 A.2d 1140, 1142 (1980). In addition, review by the Court of Common Pleas on the determination of the review officer is not appellate review but instead is *de novo*. This is because the determination of the review officer is not a final order that is subject to appeal to an appellate court. *Matter of J.S.*, 142 Pa. Cmwlth. 493, 498, 597 A.2d 750, 752 (1991).

**18.** In *In re Condry*, 304 Pa.Super. 131, 135–36, 450 A.2d 136, 138 (1982), this court held that the trial court, when reviewing a section 7303 certification by a mental health review officer, does not have to have a copy of the transcript of the master's hearing before it upon review if the trial court allows the parties to present evidence before it.

trial court to enforce the recommendations of the mental health review officer without an independent review of the evidence.[19]

This due process violation was not cured by the *ex post facto* holding of a hearing on appellant's petition for review. Appellant's petition for the trial court for review challenged not only the section 7304 order but also the order requiring the original treatment. Under section 7304, if the person has already been receiving treatment, all that needs to be shown to approve the section 7304 order is that the person's commitment history shows that the requisite behavior occurred in the past and that the person is still a danger to himself or others. 50 P.S. § 7304(a)(2). In addition, in challenging the original commitment order, the **burden is on the person receiving treatment** to show that the original commitment was improper. *Commonwealth v. Romett*, 372 Pa.Super. 41, 46, 538 A.2d 1339, 1342 (1988), *alloc. denied*, 522 Pa. 575, 559 A.2d 36 (1989). The absence of a record of the review officer's hearings placed an almost impossible burden on the appellant to show that both the original commitment and the 90 days commitment were improper.

As we have previously stated, "[w]here, as here, the [MHPA] has provided for specific procedural protections, and the procedures mandated are not followed, involuntary commitment is improper." *Commonwealth v. C.B., supra*, at 182, 452 A.2d at 1375. The importance of this principle cannot be overstated. The failure of the county in this case to follow the required procedures left appellant detained against her will with no way to get out, or to fully understand the proceedings against her. To her the experience of the literary figure of

19. We also note that under Pennsylvania law regarding administrative law and procedure, an adjudication by a local government agency requires a record unless the reviewing court conduct a de novo hearing. 2 P.S. § 553; *Monaghan v. Board of School Directors*, 152 Pa.Cmwlth. 348, 353–53, 618 A.2d 1239, 1240 (1992)(citing *Geissler v. Board of Commissioners of Upper Dublin Township*, 76 Pa.Cmwlth. 426, 463 A.2d 1284 (1983)). No de novo hearing was conducted in this case until **after** the trial court had ordered the 90 day treatment.

Joseph K. became very real.[20]

CONCLUSION:

Due to the lack of compliance with the requirements of the Mental Health Procedures Act, specifically 50 P.S. § 7302 regarding emergency examinations with or without a warrant, and the failure of the county to maintain a record of the hearings conducted pursuant to 50 P.S. § 7303 and 50 P.S. § 7304, appellant's commitment was improper.[21]

Consequently, the order of the Court of Common Pleas of Fayette County is reversed.

HUDOCK, J. files a dissenting statement.

HUDOCK, Judge, dissenting.

Respectfully, I must dissent. Assuming the correctness of the majority's holding that the warrant for emergency examination pursuant to section 7302(a) of the MHPA is to be judged by the same standard as an arrest warrant, I find the contents of the "reasonable grounds" section of the application to be sufficient probable cause to justify having J.M. involuntary examined. The majority correctly points out that in the probable cause for arrest context only the information within the four corners of the warrant may be examined in determining whether the warrant is sufficient. The majority then promptly goes outside the warrant and considers the testimony of the applicant, Patrick Morrison, to show the insufficiency of the reasonable grounds section of this warrant.

Staying within the four corners of the warrant, I find it to be sufficient. It states that J.M. has made "many calls" to law enforcement agencies such as the FBI, city police, Attorney

20. "You can't go out, you are arrested." "So it seems," said K. "But what for?" he added. "We are not authorized to tell you that. Go to your room and wait there. Proceedings have been instituted against you, and you will be informed of everything in due course."
Franz Kafka, *The Trial*, 3 (1925).

21. Nothing in this opinion should be read as precluding the County from reinstituting commitment procedures against the appellant if they are warranted. The County, however, must adhere to the proper due process requirements.

General's Office, Pittsburgh Rape Hotline, and "many others". It also sets forth that she believes she is a federally protected witness. The majority finds that each of these assertions has not been properly proven, e.g., Mr. Morrison never checked with the FBI to see whether J.M. was a federally protected witness. Had he done so, it is arguable whether the FBI would know immediately or would reveal it if they did know that J.M. was a federally protected witness. Furthermore, viewing the reasonable grounds section of the application in a common sense fashion, the allegations describe conduct not consistent with that of a rational, mentally healthy person. For example, if J.M. was raped, which might reasonably lead her to call a rape hotline, it seems reasonable that she would call a rape hotline in the Uniontown, Pennsylvania area, rather than in the City of Pittsburgh, which is 30 or 40 miles from Uniontown. Furthermore, it is rather unusual behavior for a rape victim to call the Attorney General's Office, as well as the FBI. In summary, I would find the reasonable grounds section of the application to be sufficient.

Furthermore, assuming that the reasonable grounds section was insufficient, I find the proceedings proper under the emergency examination without a warrant provisions of 50 P.S. section 7302(a)(2). When Mr. Morrison attempted to serve the warrant, J.M. would not permit him or the police to enter the house, but once they had forcibly entered, she pointed a loaded automatic pistol at the police and Mr. Morrison, and threatened to shoot herself and her 23–year–old son. When Mr. Morrison added this information to the warrant, I believe this constituted a sufficient "written statement setting forth the grounds for believing the person is in need of immediate medical treatment" pursuant to section 7302(a)(2). The majority dismisses this dangerous, threatening behavior on the part of J.M. by justifying it as self-defense provoked by the police when they forcibly entered her home. One could argue that such conduct was reasonable with regard to the intruders, but it cannot explain J.M.'s threat to shoot herself and her own son who was in the house with her.

Considering all the surrounding circumstances, I would find both the "reasonable grounds" section of the warrant to be sufficient, and that the proceedings also were in accord with the provisions of 50 P.S. section 7302(a)(2) regarding emergency examinations without a warrant.

I must also respectfully dissent from the majority's treatment of the second issue. The majority frames this issue as "... whether Appellant's due process rights were violated because no record of the hearings before the mental health review officer were produced." Appellant, however, frames the issue as insufficiency of evidence at the petition for review hearing, and never in her brief complains of lack of a record. Not having been raised, this issue is waived.

Even if Appellant had properly raised this issue, not having been raised below, it would be deemed waived. *See Brown v. Philadelphia Tribune Co.*, 447 Pa.Super. 52, 668 A.2d 159. (Issues not raised below are waived on appeal, even if issues raised on appeal are of constitutional dimension.)

Accordingly, I dissent.