J-A03002-15

2015 PA Super 157

| IN RE: NANCY WHITE VENCIL | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: NANCY W. VENCIL | No. 472 MDA 2014 |

Appeal from the Order February 24, 2014
In the Court of Common Pleas of Cumberland County
Civil Division at No(s): 12-665

BEFORE: MUNDY, J., STABILE, J., and FITZGERALD, J.[*]

OPINION BY MUNDY, J.: **FILED JULY 21, 2015**

Appellant, Nancy Vencil, appeals from the February 24, 2014 order denying her petition to expunge, filed in accordance with Section 6111.1(g)(2) of the Pennsylvania Uniform Firearms Act of 1995 (UFA).[1] Through her petition, Appellant seeks the expungement of the records submitted to the Pennsylvania State Police (PSP) of her April 2, 2003 involuntary commitment, made pursuant to Section 7302 of the Mental Health Procedures Act of 1973 (MHPA),[2] for involuntary emergency

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 6101-6187.

[2] 50 P.S. §§ 7101-7503.

examination and treatment for up to 120 hours (302 commitment). After careful review, we reverse.

The procedural and factual history as contained in the certified record unfolded as follows. On February 3, 2012, Appellant filed a petition to expunge a mental health notification record. Respondent, the PSP, filed an answer and new matter on March 9, 2012. Respondent, Holy Spirit Hospital of the Sisters of Christian Charity (Holy Spirit), filed an answer on October 23, 2013.[3] The matter proceeded to a hearing on January 17, 2014. Based on testimony received at the hearing, the trial court made the following findings.

> On the evening of April 1, 2003 [Appellant] went to the emergency room at the Holy Spirit Hospital complaining of "burning eyes, swollen nostrils, and pulmonary problems." She also "asked for her saliva to be tested."
>
> As it turns out [Appellant] had suffered a "chemical injury" from a household product the previous year. The injury resulted in an "environmental illness" and various complications. Since suffering the injury she was unable to live with her husband in their home. Over the 6 months immediately prior to April 1 she had stayed in at least 10 different hotels; had lived with her parents; and had even tried "corporate housing." By her own admission, when she presented to the emergency

---

[3] Appellant filed preliminary objections to Holy Spirit's answer based on its untimeliness, which the trial court overruled in part at the January 17, 2014 hearing. N.T., 1/17/14, at 4. Appellant included the trial court's January 17, 2014 ruling in her concise statement of errors complained of on appeal. Appellant has elected not to further pursue that issue. Appellant's Rule 1925(b) Statement, 4/4/14, at 2, ¶ 7; Appellant's Brief at 4 n.1.

room she was "depressed", "extremely frustrated" and "cried at times." Because of [Appellant's] emotional state[,] the emergency room physician summoned her sister to the hospital and requested the involvement of a crisis worker.

David Diehl is a trained crisis worker who has been with the Holy Spirit Behavioral Health Center since 1985. He met with [Appellant] and her sister at 9:21 p.m. on April 1, 2003. He spent a good deal of time talking with her. [Appellant] reported that she had been sleeping very little and not eating well as a result of her illness. She also reported being depressed and feeling hopeless. She cried nearly non-stop during their time together.

Eventually Mr. Diehl and her sister convinced [Appellant] to voluntarily admit herself to the psychiatric unit for treatment. However, when they got to the unit, [Appellant] changed her mind. At some point thereafter she told Mr. Diehl that she wanted to kill herself.

Mr. Diehl was very concerned about [Appellant's] mental state. He advised her that she should not leave the hospital. After some discussion[,] they all agreed to a safety plan where she would go home with her sister. However, as [Appellant] put it, "Once l got to the door, I fled."

Mr. Diehl watched as she jumped into her car and "took off." Even though it was after midnight she drove with her headlights off and traveled the wrong way on a one-way road as she left the parking lot. Mr. Diehl was "very nervous" and afraid she might be involved in a collision.

At that point, Mr. Diehl filled out an application for a 302 commitment. Sometime later he was called by one of [Appellant's] friends who reported that [Appellant] was just sitting in her car parked in the friend's driveway. By the time the police responded, she was gone. At 10:40 a.m. on April 2[,] the same friend called again to express concern

for [Appellant's] safety and to tell him the hotel where [Appellant] could be found.

The police located [Appellant] at the hotel. They transported her to Holy Spirit Hospital to be examined pursuant to the warrant issued in connection with the 302 application. Upon arrival Mr. Diehl explained the "Patient's Rights" form to her, but she did not appear to understand. At 2:10 p.m. on April 2, 2003 she was examined by the psychiatrist David Petcash, M.D. After noting the history which included many of the facts recited above, he recorded the results of his "mental status examination" which included the following:

> Patient is a 49 year old white female who was seen in the ECU. She was dressed in normally appropriate clothing. Her reaction was one of poor cooperation. Her eye contact was poor. Patient did have some psychomotor agitation present. Patient was alert, oriented x 3. Mood appeared to be extremely anxious and dysphoric as well as irritable. Her affect was at times labile. ... Insight and judgment into her condition appear to be impaired. Also, it was noteworthy that patient continued to have apparent delusions regarding sensitivity to multiple environmental agents described above, including exposure to "Turtle Wax."

His provisional diagnosis included, *inter alia*, "delusional disorder", "depressive disorder, nos" and "rule out major depression, severe, with psychotic features." Dr. Petcash determined that [Appellant] should be involuntarily committed for further treatment in accordance with Section 302 of the Act.

[Appellant] was admitted to the psychiatric unit on suicide watch. She was transferred to the care of another psychiatrist, Sylvester De La Cruz, M.D. She would only talk with Dr. De La Cruz in the presence of her husband and her lawyer.

Dr. De La Cruz met with [Appellant], her husband, and her lawyer at 3:30 p.m. on April 3, 2003. They all asked Dr. De La Cruz to discharge her. Apparently at the doctor's request, [Appellant] wrote the following statement on her chart:

"I do not have thoughts of suicide nor do I desire to harm myself or others. I only wish to gain relief from multiple chemical sensitivities. I look forward to my full recovery soon!"

While Dr. De La Cruz suggested that she remain in the unit for treatment on a voluntary basis, [Appellant] refused. She did agree to pursue individual counselling as an outpatient. Being satisfied that there were no grounds for "further 302 commitment", Dr. De La Cruz discharged her.

Trial Court Opinion, 12/18/14, at 1-5 (citations omitted).

On February 24, 2014, the trial court denied Appellant's petition to expunge. Appellant filed a motion to reconsider and a motion for post-trial relief on March 6, 2014, both of which the trial court denied on March 11, 2014. Appellant filed a timely notice of appeal on March 14, 2014.[4]

On appeal, Appellant raises the following issue for our review.

Whether the clear and present danger standard is satisfied under 50 P.S. § 7301: when an individual does not make a specific active threat of suicide (rather a vague reference to suicidal thoughts in the past tense) and does not take any actions in furtherance of a specific threat?

---

[4] Appellant and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925.

- 5 -

Appellant's Brief at 4.[5]

We begin with a discussion of the nature of the underlying proceedings and the scope and standard of our review of the trial court's decision in this matter. "Our well-settled standard of review in cases involving a motion for expunction is whether the trial court abused its discretion." *Commonwealth v. Smerconish*, 112 A.3d 1260, 1263 (Pa. Super. 2015), *quoting* *In re Keyes*, 83 A.3d 1016, 1022 (Pa. Super. 2013), *appeal denied*, 101 A.3d 104 (Pa. 2014). However, "[q]uestions of evidentiary sufficiency present questions of law; thus, our standard of review is *de novo* and our scope of review is plenary. In conducting sufficiency review, we must consider the evidence in the light most favorable to the [party that] prevailed upon the issue at trial." *Commonwealth v. Meals*, 912 A.2d 213, 218 (Pa. 2006) (internal quotation marks and citations omitted).

The instant proceedings were brought under Section 6111.1(g)(2) of the UFA. Section 6111.1(g)(2) provides a means to petition for expungement of records held by the PSP of an individual's involuntary 302 commitment. 18 Pa.C.S.A. § 6111.1(g)(2). Expungement will be ordered upon a finding by the trial court that the evidence is insufficient to justify such a commitment. *Id.* We next review the text of the relevant statutes.

---

[5] Holy Spirit filed an appellee brief, which the PSP have incorporated by reference in lieu of filing its own appellee brief. *See* Pa.R.A.P. 2137 (permitting, in cases with multiple parties, adoption of another party's brief by reference).

The MHPA sets forth the factual threshold to be met before an individual may be subject to involuntary examination and treatment under the Act.

> **§ 7301. Persons who may be subject to involuntary emergency examination and treatment**
>
> **(a) Persons subject.**—Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.
>
> **(b) Determination of Clear and Present Danger.**-
>
> …
>
> (2) Clear and present danger to himself shall be shown by establishing that within the past 30 days:
>
> …
>
> > (ii) the person has attempted suicide and that there is a reasonable probability of suicide unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; …

50 P.S. § 7301 (a), (b)(2)(ii).

The MHPA sets forth the following procedures for initiating an involuntary commitment for emergency short-term examination and treatment.

**§ 7302. Involuntary emergency examination and treatment authorized by a physician--not to exceed one hundred twenty hours**

**(a) Application for Examination.**--Emergency examination may be undertaken at a treatment facility upon the certification of a physician stating the need for such examination; or upon a warrant issued by the county administrator authorizing such examination; or without a warrant upon application by a physician or other authorized person who has personally observed conduct showing the need for such examination.

(1) Warrant for Emergency Examination.-- Upon written application by a physician or other responsible party setting forth facts constituting reasonable grounds to believe a person is severely mentally disabled and in need of immediate treatment, the county administrator may issue a warrant requiring a person authorized by him, or any peace officer, to take such person to the facility specified in the warrant.

…

**(b) Examination and Determination of Need for Emergency Treatment.**--A person taken to a facility shall be examined by a physician within two hours of arrival in order to determine if the person is severely mentally disabled within the meaning of section 301 and in need of immediate treatment. If it is determined that the person is severely mentally disabled and in need of emergency treatment, treatment shall be begun immediately. If the physician does not so find, or if at any time it appears there is no longer a need for immediate

treatment, the person shall be discharged and returned to such place as he may reasonably direct. The physician shall make a record of the examination and his findings. …

…

**(d) Duration of Emergency Examination and Treatment.**--A person who is in treatment pursuant to this section shall be discharged whenever it is determined that he no longer is in need of treatment and in any event within 120 hours, unless within such period:

(1) he is admitted to voluntary treatment pursuant to section 202 of this act; or

(2) a certification for extended involuntary emergency treatment is filed pursuant to section 303 of this act.

50 P.S. § 7302(a), (b), (d) (footnotes omitted).

In the instant case, Dr. De La Cruz discharged Appellant within 120 hours of her involuntary admission. The MHPA does not provide a procedure for challenging a 302 commitment that is not followed by a petition seeking a longer-term commitment for treatment under Section 303 or 304 of the Act. Section 6111.1(g)(2) of the UFA, however, provides a basis to challenge the evidentiary sufficiency of a 302 commitment.[6]

---

[6] This provision is included in the UFA because a consequence of any involuntary mental health commitment in Pennsylvania includes a restriction on possessing firearms, and the PSP are required to maintain records of such commitments to facilitate enforcement of said restrictions. *See* 18 Pa.C.S.A. §§ 6105, 6111.1(f). We have held that, by its terms, relief under Section 6111.1(g)(2) is not available for individuals who were subject to involuntary commitment for longer terms under other sections of the MHPA. *In re*
*(Footnote Continued Next Page)*

**§ 6111.1. Pennsylvania State Police**

**(a) Administration.--**The Pennsylvania State Police shall have the responsibility to administer the provisions of this chapter.

…

**(g) Review by court.--**

…

(2) A person who is involuntarily committed pursuant to section 302 of the Mental Health Procedures Act may **petition the court to review the sufficiency of the evidence upon which the commitment was based**. If the court determines that the evidence upon which the involuntary commitment was based was insufficient, the court shall order that the record of the commitment submitted to the Pennsylvania State Police be expunged. A petition filed under this subsection shall toll the 60-day period set forth under section 6105(a)(2).

18 Pa.C.S.A. § 6111.1(a), (g)(2) (emphasis added).

We observe that Section 6111.1(g)(2) does not prescribe a specific

review procedure to be followed by a trial court when evaluating the

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯
**Jacobs**, 15 A.3d 509, 511 (Pa. Super. 2011); **but see In re R.F.**, 914 A.2d 907, 908 (reviewing a trial court's denial of a petition to expunge **court** and **hospital** records of both a 302 and a 303 commitment, noting "that a person who has been unlawfully committed to a state mental facility has a constitutional right to the destruction of hospital [and court] records created as a result of the illegal commitment"), _appeal denied_, 929 A.2d 1162 (Pa. 2007) _citing_ **Commonwealth v. J.T.**, 420 A.2d 1064, 1065 (Pa. Super. 1980).

sufficiency of the evidence resulting in a 302 commitment. In this case, the trial court performed a hearing *de novo*, which we conclude was proper and required. **See** N.T., 1/17/14, at 1-62. We base our conclusion initially on the legislative intent discernible from the meaning of the statute, despite its lack of precise direction.

Our standard for such an inquiry is as follows.

> "An issue of statutory construction presents a pure question of law and our standard of review is *de novo* and our scope of review is plenary." **Spahn v. Zoning Bd. of Adjustment**, 602 Pa. 83, 977 A.2d 1132, 1142 (2009). "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a).

**In re T.B.**, 113 A.3d 1273, 1276 (Pa. Super. 2015). When a statute is not explicit, we consider a variety of factors to ascertain the legislative intent, including the object of the provision and the consequences of different interpretations. **Id.**, *citing* 1 Pa.C.S. § 1921(a). "Absent a definition, statutes are presumed to employ words in their popular and plain everyday sense, and popular meanings of such words must prevail." **Zimmerman v. Harrisburg Fudd I, L.P.**, 984 A.2d 497, 501 (Pa. Super. 2009) (internal quotation marks and citations omitted), *appeal denied*, 992 A.2d 890 (Pa. 2010).

Our Supreme Court has clarified that for purposes of the MHPA, in cases where the basis for an involuntary commitment under Section 302 is tested in a subsequent Section 303 proceeding by a mental health review

officer, the trial court's review of the mental health review officer's decision is "in the nature of *de novo*," because the mental health review officer's determinations are not final orders. *In re T.J.*, 739 A.2d 478, 480 n.1. (Pa. 1999); *see* 50 P.S. § 1709 (providing for trial court review of the certifications of a mental health review officer); *see also In re Involuntary Commitment of Barbour*, 733 A.2d 1286, 1288 (Pa. Super. 1999) (holding, "the Court of Common Pleas is to conduct a *de novo* review of the determination of the mental health review officer[…] because the determination of the review officer is not a final order that is subject to appeal to an appellate court[]") (citation omitted).

As noted above, the MHPA does not provide for direct review of a 302 commitment. Consequently, Section 6111.1(g)(2) provides the only legislatively authorized judicial review of a 302 commitment when no extension of the involuntary commitment was sought. We conclude that at a minimum, the *de novo* hearing afforded within the MHPA is required for Section 6111.1(g)(2). *See* 50 P.S. § 1709; *In re T.J.*, *supra*. Therefore, given the function and purpose of Section 6111.1(g)(2), we deem the logic of the Supreme Court's application of *de novo* review to the MHPA, in general, applies equally to its review of the sufficiency of the evidence underlying a 302 commitment.

Having determined that a *de novo* hearing by the trial court is required for Section 6111.1(g)(2) reviews, we must also address the appropriate

scope of the required *de novo* hearing. In the case of a Section 6111.1(g)(2) sufficiency review of a 302 commitment, there is no record for the trial court to review, and a full *de novo* hearing is therefore required.[7] Accordingly, we reject Holy Spirit's contention that the trial court is limited in its Section 6111.1(g)(2) sufficiency review to only the information available to the Section 302 petitioner and examining physician. **See** Holy Spirit's Brief at 8.[8] For example, in this case, it was proper for the trial court, while conducting its *de novo* hearing, to consider the medical reports of Appellant's treating physicians, regarding her environmental sensitivities, to discount the Section 302 petitioner and evaluating physician's diagnosis of a delusional disorder as an underlying cause of Appellant's observed behaviors. **See** Trial Court Opinion, 7/18/14 at 7-8.

---

[7] We note that this Court has held that while a trial court's review of a mental health review officer's determination need not be "a full *de novo* hearing," some hearing is required. **In re Estate of S.G.L.**, 885 A.2d 73, 74-75 (Pa. Super. 2005). Unlike the circumstances in the case *sub judice*, this holding is premised on the fact that a record exists of the mental health review officer's hearing, to which the trial court has access. "While the [trial court] can review the record before the mental health review officer, the rule *does* require a 'hearing,' not merely a conference …. For a proceeding to qualify as a hearing, there must be a record and the opportunity … to make argument and at least *offer* supplemental evidence." **Id.** at 75 (emphasis in original).

[8] We note with disapproval Holy Spirit's citation to a trial court opinion that was adopted as our own in **In re C.N.**, 32 A.3d 261 (Pa. Super. 2011) (unpublished memorandum adopting trial court opinion). **See** Internal Operating Procedures of the Superior Court of Pennsylvania § 65.37 (prohibiting citation to unpublished memoranda as authoritative except under limited circumstances not applicable here).

The very essence of a *de novo* hearing entails that parties be permitted to present evidence as shown by the following text:

> Black's Law Dictionary defines a hearing *de novo* as "a new hearing or a hearing for the second time, contemplating an entire trial in same manner in which matter was originally heard and a review of previous hearing. On hearing '*de novo*' court hears matter as court of original and not appellate jurisdiction." Black's Law Dictionary 649 (5th ed.1979). Our case law accords with this definition. **See Commonwealth v. Virnelson**, 212 Pa.Super. 359, 367, 243 A.2d 464, 469 (1968) (*de novo* review entails full consideration of the case anew, and the reviewing body is in effect substituted for the prior decision maker and redecides the case); **Young v. Department of Environmental Resources**, 144 Pa.Cmwlth. 16, 20, 600 A.2d 667, 668 (1991)("*[d]e novo* review involves full consideration of the case anew"). …

**Asin** [**v. Asin**], 690 A.2d [1229,] 1232-1233 [(Pa. Super. 1997)]. Along the same lines, in **Rebert** [**v. Rebert**, 757 A.2d 981 (Pa. Super. 2000)], a case involving child support and spousal support, we stated that:

> … In **Warner** [**v. Pollock**, 434 Pa.Super. 551, 644 A.2d 747, 750 (Pa.Super.1994)] [], this Court stated under Rule 1910.11 "one demands a hearing, one does not file an appeal." **Id.** at 750. The Court emphasized the differences between an appeal and a hearing *de novo*, explaining an appeal deals with assertion of specific error whereas a *de novo* hearing is a full reconsideration of the case.

**Rebert**, 757 A.2d at 984.

**Capuano v. Capuano**, 823 A.2d 995, 1002-1003 (Pa. Super. 2003).

- 14 -

Next, we address the appropriate standard of proof to be applied to the trial court's *de novo* review of a 302 commitment. Section 6111.1(g)(2) is, again, silent on the standard of proof to be employed by the trial court in its *de novo* sufficiency review. Instantly, the trial court noted it applied the clear and convincing evidence standard. ***Id.*** at 6. We conclude the trial court articulated the correct standard. Again, we draw parallels to this court's decisions interpreting the MHPA. Faced with a similar lack of legislative direction, we held the scope of a trial court's review of 303 commitment certified by a mental health review officer required application of the clear and convincing evidence standard of proof. ***In re Hancock***, 719 A.2d 1053, 1055-1057 (Pa. Super. 1998). The ***Hancock*** Court explained as follows.

> Consideration of cases addressing omissions in legislative drafting requires the most critical and sensitive judicial analysis. It is not the role of the courts to add provisions which the legislature has omitted unless the phrase is necessary to the construction of the statute. ….
>
> Sometimes, however, situations arise that require this Court to address the practical ramifications of the application of the law as written and establish a clearly defined uniform rule in the absence of clarity by the legislature. After all, [w]e are to presume that the legislature did not intend a result that is absurd or unreasonable. Allowing the courts to continue to apply an unclear and unworkable standard of proof in the certification of extended involuntary emergency treatment would allow potentially absurd or unreasonable results to occur. Thus, while this Court recommends that the legislature consider revising the language in MHPA

§ 303 in order to best clarify and effectuate its intent by specifying an appropriate standard of proof, we feel that we cannot wait for future legislative action. It is clear that the MHPA squarely places responsibility for its administration in the courts.

…

In holding that the appropriate standard of proof for certification of extended involuntary treatment is clear and convincing evidence, this Court provides a definitive and recognizable standard for judges and mental health review officers to follow in subsequent cases.

*Id.* (internal quotation marks and citations omitted), *accord In re R.F.*, *supra* at 909.[9]  We conclude the same principles we discussed above for adopting *de novo* review to a trial court's Section 6111.1(g)(2) review requires adoption of the clear and convincing evidence standard.

"Clear and convincing evidence is the highest burden in our civil law and requires that the fact-finder be able to come to clear conviction, without

_____

[9] We note this Court has recently cited our Supreme Court's case of *In re J.M.*, 726 A.2d 1041 (Pa. 1999), as establishing "the standard for evaluating the validity of [Section 302 warrants] is whether reasonable grounds exist to believe that a person is severely mentally disabled and in need of immediate treatment." *Smerconish*, *supra* at 1264.  This aspect of the holding of the Supreme Court in *In re J.M.* was concerned with a procedural challenge to the issuing of a 302 warrant, not the subsequent mental health evaluation and 302 commitment or a Section 6111.1(g)(2) review of the same.  On appeal, this Court had equated the prerequisites for a 302 mental health warrant with the requirements for a criminal arrest warrant.  *In re J.M.*, 685 A.2d 185 (Pa. Super. 1996) (unpublished memorandum).  The Supreme Court determined this was error and that the lesser standard cited above was applicable.  *In re J.M.*, *supra*.  The Supreme Court in *In re J.M.* did not address the level of proof required for a sufficiency review of a 302 commitment.  *See Id.*

hesitancy, of the truth of the precise fact in issue." ***Weissberger v. Myers***, 90 A.3d 730, 735 (Pa. Super. 2014) (citations omitted).

> "Clear and convincing evidence" requires: [that t]he witnesses must be found to be credible[;] that the facts to which they testify **are distinctly remembered and the details thereof narrated exactly** and in due order[;] and that their testimony is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. It is not necessary that the evidence be uncontradicted provided it carries a clear conviction to the mind or carries a clear conviction of its truth.

***In re Novosielski***, 992 A.2d 89, 107 (Pa. 2010) (emphasis added, citations and footnote omitted), *cert. denied sub nom.*, ***Modzelewski v. Proch***, 131 S. Ct. 918 (2011).

> Appellate courts usually accept the evidentiary supported findings of [a fact-finder] but, when the issue is whether the evidence presented was clear, direct, precise and convincing, a question of law is presented and such issue is clearly for determination by appellate court. The appellate courts **need not accept as true [a fact-finder's] conclusion as to whether the required norm or standard of proof has been met**.

***In re Nicolazzo's Estate***, 199 A.2d 455, 457 (Pa. 1964) (emphasis added, citations omitted).

With these principles in mind, we proceed to address Appellant's issue on appeal. The essence of Appellant's claim is that the trial court erred in determining there was sufficient evidence to support the factual threshold for an involuntary commitment under Section 302. Appellant's Brief at 15.

"Appellant's original petition for expunction challenges this involuntary civil commitment as lacking a foundation in facts, on the grounds that she was not severely mentally disabled, as defined by the MHPA and in need of immediate treatment." *Id.* at 19. The trial court based its decision on the following findings.

> Sometime thereafter she told Mr. Diehl that **she wanted to kill herself**. While he was very concerned he felt comfortable in allowing her to go home so long as she was accompanied by her sister. However, petitioner fled as soon as they reached the door. She jumped in her car and drove away very erratically. Her **articulated desire to commit suicide** coupled with those subsequent actions were sufficient to satisfy the "clear and present danger" requirement of the Act.

Trial Court Opinion, 7/18/14, at 7 (emphasis added).

Appellant counters "the record [] does not support any clear or specific desire by Appellant to imminently commit suicide, leaving Appellant's loss of liberty resting unsoundly on a solitary instance of 'idiosyncratic behavior' to wit: Mr. Diehl's brief observation of erratic driving." Appellant's Brief at 16, *citing **Addington v. Texas***, 441 U.S. 418, 427 (1997) (holding involuntary commitment cannot be based on mere idiosyncratic behavior or "a few isolated instances of unusual behavior," but must be based on clear and convincing evidence or like standard).

In the instant case, Mr. Diehl, the 302 petitioner, was the Crisis Worker for Holy Spirit. In his 302 petition, Mr. Diehl indicated the basis for

his conclusion that Appellant presented a clear and present danger to herself by checking the box on the petition form with the following language.

> [Within the last 30 days,] the person has attempted suicide and that there is reasonable probability of suicide unless adequate treatment is afforded under this act. For the purpose of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide[.]

N.T., 1/17/14, at 5, Respondent's Exhibit 1, Application for Involuntary Emergency Examination and Treatment at 2, Pt. I, ¶ (ii). Mr. Diehl included the following written factual narrative in support of that conclusion.

> Client is delusional and depressed. Living past 6 months in hotel rooms to escape exposure to chemicals. Told undersigned that she **has had suicidal thoughts** because of the condition. Left hospital premises driving erratically- *i.e.* with headlamps off at night and driving out an entrance only road. This all having occurred on 4/1/03.

*Id.* at 3, Pt. I (emphasis added).

At the *de novo* expungement hearing, Mr. Diehl testified about Appellant's statement of suicidal thoughts as follows.

> THE COURT: Do you know when it was she articulated that she wanted to kill herself?
>
> THE WITNESS: I don't.
>
> THE COURT: Did she ever?
>
> THE WITNESS: She would have had to have said that she had suicidal thoughts. That is what I wrote in the 302 petition. That's not something I would make up about somebody.

THE COURT: So, it wasn't at the time that you evaluated her in the ER, she was just talking about passive thoughts at that point?

THE WITNESS: Correct.

THE COURT: So, you're saying that sometime after that initial evaluation she would have told you she had suicidal ideations?

THE WITNESS: Yes, I'm saying that.

…

THE COURT: Just so I understand. Are you saying that sometime after your write-up she expressed active suicidal thoughts?

THE WITNESS: It was a long time ago. I wouldn't write it down as a petitioner on a legal document that someone told me they were suicidal if that statement weren't made.

THE COURT: Okay.

THE WITNESS: I don't recall the exact words or anything like that, no.

…

BY [Appellant's Counsel]: If somebody started to describe active thoughts, you would record that somewhere, correct?

A Yes.

Q In this case, there is no record of any description of any of her active thoughts of suicide, correct?

A Correct. I will tell you that when we leave the ER and we go to the inpatient psychiatric unit, I have papers with me I hand them to the

inpatient unit.  So, there would be conversations and things said there that I'm going to come back and record later, also.

THE COURT:  Are you saying that you recorded this on the petition?

THE WITNESS:  There would be things on the petition that don't appear on the write-up and things on the write-up that don't appear on the petition. I'm not recording everything she said.

THE COURT:  I guess my question is, are you saying -- he asked you if she had articulated active suicidal thoughts would you record it, and you said, yes, I would record it?

THE WITNESS:  Right.

THE COURT:  My question is, are you saying you recorded this on the petition itself?

THE WITNESS:  I did record it on the petition.

…

N.T., 1/17/14, at 42-43, 52-53.

Based on the foregoing, we conclude the trial court's finding that Appellant made a threat to commit suicide is not supported by clear and convincing evidence in the record.  The only mention of a threat is Diehl's statement in the 302 petition that Appellant "[t]old [him] that she has had suicidal thoughts."  N.T., 1/17/14, at 5, Respondent's Exhibit 1, Application for Involuntary Emergency Examination and Treatment at 3, Pt. I.  That statement does not give any indication of when such thoughts occurred, but the use of the construction "has had" as opposed to "is having" clearly

indicates they were in the past. Neither does Diehl's report or 302 petition contain any contemporaneous description of the nature of those thoughts, *i.e.*, if they were passive in nature or if they constituted an actual threat. Furthermore, at the January 17, 2014 *de novo* hearing, Mr. Diehl testified he did not "recall [Appellant's] exact words or anything like that" but indicated he would not write something in a petition that did not happen. N.T., 1/17/14, at 52. Ultimately, in his testimony, Mr. Diehl did not expand on his written account contained in the 302 petition. "She would have had to have said that she had suicidal thoughts. That is what I wrote in the 302 petition." *Id.* at 42.

Based on our thorough review of the record, we conclude there is not clear and convincing evidence sufficient to support the trial court's finding that Appellant "wanted to kill herself" or "articulated [a] desire to commit suicide." Trial Court Opinion, 7/18/14, at 7; *see In re Nicolazzo's Estate*, *supra*. The only such references in the transcript were in the questions posed to Diehl, which he did not endorse, but rather deferred to his perfunctory written account in the 302 petition. N.T., 1/17/14, at 52. This testimony regarding Appellant's statement and the attendant circumstances was not "distinctly remembered and the details thereof narrated exactly." *In re Novosielski*, *supra*.

We similarly conclude the evidence failed to establish any act in furtherance, even had such a threat of suicide been made. There is no

account or testimony of how Appellant's driving out of the hospital parking lot in an unsafe manner related to such a threat.

We further note the evaluation by Dr. Petcash did not contain any independent account of Appellant's alleged suicidal thoughts, noting "according to Mr. Deihl, … [Appellant] expressed suicidal ideations."  N.T., 1/17/14, at 5, Respondent's Exhibit 1, Application for Involuntary Emergency Examination and Treatment at 7, Pt. VI, ¶ (ii).  Thus, Dr. Petcash's evaluation provides no additional factual basis, clear and convincingly or otherwise, into the factual predicate to Appellant's involuntary commitment of a threat to commit suicide and commission of an act in furtherance thereof.  **See** 50 P.S. § 7301(b)(2)(ii).

The facts of the instant case stand in stark contrast to the more specifically developed facts present in **In re R.F.**, which we concluded were sufficient for a 302 commitment and included the following.

> 1) Appellant's stress over divorce proceedings initiated by his wife, as well as her securing exclusive possession of the marital home; 2) Appellant's searching the internet for data on "How to commit suicide," and following this by calling a suicide hotline for information on the topic provided on the web site; 3) Appellant's denial when inquiry was made by police and medical personnel regarding possession of loaded weapons in his home  and truck; 4) Appellant's admission to the hotline operator and medical personnel that he had contemplated suicide; 5) Appellant's suicide ideation is confirmed by hospital records; and 6) finally, the trial court attributing Appellant with a lack of credibility at the [expungement] hearing….

*In re R.F.*, *supra* at 915-16; *see also J.C.B. v. Pa. State Police*, 35 A.3d 792, 793-794 (Pa. Super. 2012) (determining, in the context of a review under 18 Pa.C.S.A. § 6105(a) petition for reinstatement of gun rights, that evidence was sufficient for 302 commitment where committee appeared at hospital for foot injury but reported to hospital personnel that he had suicidal thoughts and the night before had put a gun to his head and pulled the trigger), *appeal denied*, 49 A.3d 444 (Pa. 2012), *cert. denied*, 133 S. Ct. 1808 (2013).

For the foregoing reasons, we conclude the trial court properly conducted a full *de novo* hearing to address Appellant's petition to review the sufficiency of her 302 commitment and articulated the correct clear and convincing standard of proof. **See In re T.J.**, **supra**; **In re Hancock**, **supra.** We conclude the trial court erred as a matter of law, however, in determining the evidence of record is sufficient under that standard to show that Appellant presented a clear and present danger to herself as averred in the 302 application. **See** 50 P.S. § 7301. Specifically, neither the contemporaneous reports by the 302 petitioner and examining physician nor the testimony received at the January 17, 2014 *de novo* hearing describe anything more than a statement that Appellant "has had suicidal thoughts because of [her medical] condition." N.T., 1/17/14, at 5, Respondent's Exhibit 1, Application for Involuntary Emergency Examination and Treatment at 2, Pt. I, ¶ (ii). Without more facts establishing the time of such thoughts

and the attendant circumstances and actions connected thereto, the burden to show clear and present danger by clear and convincing evidence cannot be met. Accordingly, we reverse the trial court's February 24, 2014 order and direct that "the record of the commitment submitted to the Pennsylvania State Police be expunged." 18 Pa.C.S.A. § 6111.1(g)(2).

Order reversed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/21/2015