J-A04035-15

2015 PA Super 76

IN RE: T.B. : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
APPEAL OF: T.B. : No. 1059 WDA 2014

Appeal from the Order Entered June 2, 2014
in the Court of Common Pleas of Allegheny County,
Orphans' Court, at No(s): CC 140037

BEFORE:   BOWES, OLSON, and STRASSBURGER,* JJ.

OPINION BY STRASSBURGER, J.:          **FILED APRIL 14, 2015**

T.B. appeals from the order of June 2, 2014, which denied his petition for expungement of mental health records and restoration of rights. We affirm.

The facts of this case can be summarized as follows. On November 26, 2008, T.B. cut his face in several places after returning to his parents' house following a night of consuming alcohol and celebrating his twenty-first birthday. T.B.'s father saw blood on T.B.'s face after he got out of the shower, decided to check on him early in the morning, and discovered the cuts were still bleeding. An ambulance was called, and T.B. went to Jefferson Regional Medical Center (Jefferson) to get the cuts on his face treated. T.B. arrived at the hospital at 9:15 a.m. T.B.'s mother arrived shortly thereafter, and she voiced concern that T.B. was suicidal. She then worked with Jefferson to have T.B. committed for psychiatric treatment involuntarily pursuant to 50 P.S. § 7302 of the Mental Health Procedures Act

_____

*Retired Senior Judge assigned to the Superior Court.

(MHPA).[1] She completed the application required under section 7302(a), and a warrant pursuant to section 7302(a)(1) was issued at 1:21 p.m. A physician examined T.B. at 1:30 p.m. and determined that T.B. had self-mutilated and was a danger to himself. Thus, T.B. was committed involuntarily for the statutory 120-hour period,[2] and was released from Jefferson on November 30, 2008.

On January 30, 2014, T.B. filed a petition to "vacate and/or expunge involuntary civil commitment." Petition, 1/30/2014. Specifically, T.B. argued, *inter alia*, that his involuntary commitment was void *ab initio* because he was not examined by a physician within two hours of his arrival at Jefferson pursuant to 50 P.S. § 7302(b) ("A person taken to a facility shall be examined by a physician within two hours of arrival…."). T.B. asserted that his involuntary commitment "has caused him to suffer a loss of liberty and reputation." ***Id***. at 2 (unnumbered). Further, T.B. contended that he "suffers from permanent deprivation of fundamental state and federal constitutional rights as a direct result of his involuntary commitment[.]" ***Id***.[3]

---

[1] This procedure is known colloquially as a 302 procedure or involuntary commitment.

[2] 50 P.S. § 7302(d)(1).

[3] T.B. also asserted that, because of this involuntary commitment, the Pennsylvania State Police would not grant him permission to possess a firearm pursuant to 18 Pa.C.S. § 6105(c)(4) of the Uniform Firearms Act, which sets forth a prohibition against those who have been involuntarily committed under the MHPA from possessing a firearm. Moreover, T.B.

A hearing was held on April 29, 2014. After the hearing, the orphans' court concluded "that when a patient voluntarily receives treatment at a hospital and a subsequent 302 is completed, the requirement that a physician examine the patient within two hours, under 50 P.S. § 7302(b), begins when the 302 is authorized." Orphans' Court Opinion, 9/8/2014, at 3. Accordingly, the orphans' court held that because the warrant was authorized at 1:21 p.m., and T.B. was examined by a physician at 1:30 p.m., well within the two-hour period, T.B.'s involuntary commitment was valid and legal. Therefore, the orphans' court denied T.B.'s petition for expungement.

T.B. timely filed a notice of appeal, and both T.B. and the orphans' court complied with Pa.R.A.P. 1925. On appeal, T.B. sets forth the following question for our review: "Is a mental health commitment invalid and illegal where the Application for Involuntary Civil Commitment demonstrates, on its face, that the statutory mandates have not been followed." T.B.'s Brief at 3.

> In considering T.B.'s arguments, we bear in mind that
>
> a person who has been unlawfully committed to a state mental facility has a constitutional right to the destruction of hospital records created as a result of the illegal commitment. **Wolfe v. Beal**, 477 Pa. 477, 384 A.2d 1187 (1978). **Wolfe's** rationale has been extended to require that court records also be expunged when an illegal commitment occurs; to-wit:

---

argued that his rights under the Second Amendment of the United States Constitution were being violated. However, T.B. does not present on appeal any argument with respect to the Second Amendment or a potential denial of the right to possess a firearm.

> To be sure, the question of expungement of court records arising from an illegal commitment was not at issue in **Wolfe** simply because the lower court's decision to order such relief was not challenged. However[,] we think it clear that the Court's reasoning regarding destruction of the hospital records is equally applicable to the issue *sub judice*. Be they hospital records or court records, the dispositive fact is that they originated as a result of an illegal proceeding subsequently declared null and void; and, in either case, their "continued existence [...] pose a threat to [A]ppellant's reputation." Under such circumstances, and in the absence of any compelling reason to the contrary offered by the Commonwealth, justice demands that [A]ppellant be returned to a position as near as possible as that which [she] enjoyed prior to the illegal commitment; namely, an unsullied record.

**In re R.F.**, 914 A.2d 907, 908-09 (Pa. Super. 2006) (quoting **Commonwealth v. J.T.**, 420 A.2d 1064, 1065 (Pa. Super. 1980) (citations omitted)).

Instantly, T.B. contends that his involuntary commitment began at 9:15 a.m., when he arrived at Jefferson, even though no application pursuant to section 7302(a) had been completed. Thus, he argues that he arrived at Jefferson at 9:15 a.m. "against his will, [and was held] for over four (4) hours, before being examined by a physician" at 1:30 p.m. T.B.'s Brief at 19.

Allegheny County and the Pennsylvania State Police contend that "[i]f a person comes voluntarily to the hospital then the arrival time would be when the 302 is subsequently authorized." Allegheny County's Brief at 8.

- 4 -

Thus, Allegheny County argues that because the warrant was authorized at 1:21 p.m. and the examination by a physician occurred at 1:30, well within the two-hour period contemplated by the statute, the involuntary commitment was valid.

The process for authorizing an involuntary commitment is outlined by statute; thus, we bear in mind the rules of statutory construction. "An issue of statutory construction presents a pure question of law and our standard of review is *de novo* and our scope of review is plenary." ***Spahn v. Zoning Bd. of Adjustment***, 977 A.2d 1132, 1142 (Pa. 2009). "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." ***Id***. at (b). However,

> [w]hen the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:
>
> (1) The occasion and necessity for the statute.
>
> (2) The circumstances under which it was enacted.
>
> (3) The mischief to be remedied.
>
> (4) The object to be attained.
>
> (5) The former law, if any, including other statutes upon the same or similar subjects.
>
> (6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

*Id*. at (c). Moreover, "[i]n ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used … (1) [t]hat the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable[, and] (2) [t]hat the General Assembly intends the entire statute to be effective and certain." 1 Pa.C.S. § 1922.

Section 7302 provides the following procedure for obtaining a warrant and transporting an individual to a facility. "Upon written application by a physician or other responsible party setting forth facts constituting reasonable grounds to believe a person is severely mentally disabled and in need of immediate treatment, the county administrator may issue a warrant requiring a person authorized by him, or any peace officer, to take such person to the facility specified in the warrant." 50 P.S. § 7302(a)(1). Pursuant to 50 P.S. § 7302(b)(1), "[a] person taken to a facility shall be examined by a physician within two hours of arrival in order to determine if the person is severely mentally disabled within the meaning of section 301 and in need of immediate treatment[.]"

Thus, the words of the statute are explicit as to the situation where an individual is not at a hospital or other facility at the time it is recognized that an involuntary commitment may be necessary. Someone may obtain a

warrant permitting the transportation of the individual involuntarily to a facility for mental health treatment. Once that individual arrives at the facility, the statute requires that the individual be examined by a physician within two hours. However, the statute is silent about this time period if an individual is already at a facility when someone recognizes that a 302 may be necessary.

That is the situation we encounter in this case, where the orphans' court found that T.B. went voluntarily to Jefferson. Orphans' Court Opinion, 9/8/2014, at 4 (stating T.B. "voluntarily went to the hospital for the purpose of getting his facial lacerations treated[.]").[4] Accordingly, the orphans' court had to determine when T.B. "arrived at the facility" for the purposes of a possible involuntary commitment, therefore implicating the two hour protection provision. The orphans' court concluded that the time of arrival under these circumstances "begins when the 302 [warrant] is authorized." Orphans' Court Opinion, 9/8/2014, at 3. We agree that is the appropriate interpretation of the statute where T.B. was already at Jefferson for medical reasons prior to the application for an involuntary commitment was made.

"[I]t is axiomatic that in determining legislative intent, **all sections of a statute must be read together and in conjunction with each other**,

---

[4] This finding is supported by the record. T.B. testified that the ambulance "took [him] to the hospital saying that they're just going to clean [him] up" because his "face was bleeding." N.T., 4/29/2014, at 6. He testified that "nobody said anything about a 302 the whole time." *Id*.

and construed with reference to the entire statute." ***Allstate Life Ins. Co. v. Com.***, 52 A.3d 1077, 1080 (Pa. 2012) (emphasis added). Instantly, T.B.'s argument that the protections of section 7302(b) were triggered before the application was filed pursuant to section 7302(a) creates an absurd result. T.B. attempts to pick and choose which portions of the statute applied without reading the statute as a whole.[5]

Accordingly, we hold the orphans' court interpreted the statute properly and did not abuse its discretion in concluding that the involuntary commitment of T.B. was valid. T.B. has presented no other argument on appeal as to why his records should be expunged; therefore, we affirm the order of the orphans' court denying T.B.'s petition for expungement.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary

---

[5] This interpretation is consistent with other aspects of the statute. Where an individual is not at a facility at the time the warrant is authorized, the statute does not count the time it takes to find the individual and transport him to the facility as part of the two-hour window for physician examination.

- 8 -

Date: <u>4/14/2015</u>