J-S10019-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: B.F. | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1209 MDA 2021 |

Appeal from the Order Entered August 18, 2021
In the Court of Common Pleas of Centre County Civil Division at No(s):
21-0008

BEFORE:   MURRAY, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED:  JUNE 29, 2022**

B.F. appeals from the order denying his petition to expunge his commitment for involuntary psychiatric treatment. He claims there was insufficient evidence to support the commitment, the court erred in failing to consider testimony from his treating psychiatrist, and the commitment was not procedurally proper. We affirm.

B.F. is a student at Penn State University. In February 2021, he was 19 years old and living on campus. On February 14, 2021, B.F. became upset and took 10 of his 25 mg Seroquel tablets. He texted his mother, "I'm sorry mom goodbye." He and his mother spoke, and she called 911. When emergency medical services arrived, B.F. was alert and was transported to Mount Nittany Medical Center. He arrived at the hospital at 6:10 p.m.

_____

[*] Retired Senior Judge assigned to the Superior Court.

B.F. was assessed for a possible commitment under Section 302 of the Mental Health Procedures Act ("MHPA")[1] ("Section 302") at approximately 11:00 p.m. Amended Opinion and Order, dated Aug. 16, 2021 ("Trial Court Opinion"), at 2. Laura Hopple, CM, requested that B.F. be examined by a physician pursuant to Section 302(b), stating on an application that B.F. was "brought to Mount Nittany Medical Center via EMS after an intentional overdose of ten tablets of Seroquel 25 mg;" B.F. sent his Mother "a text message that said, 'I'm sorry mom goodbye' at 5:12 pm on 2/14/21, and then he took the Seroquel;" B.F. "ha[d] a history of depression and self[-]injurious behavior by cutting;" he "live[d] alone at Penn State and his family [was] in Maryland," and he was "not willing to sign himself for voluntary inpatient treatment." Application for Involuntary Emergency Examination and Treatment, at Part I.

Based on the information provided by Hopple, the Section 302 delegate, Maeve McCullough, signed a warrant requiring that B.F. be examined at the Mount Nittany Medical Center and, if required, be admitted to a designated facility. *Id.* at Part III.

A physician at Mount Nittany, Dr. Lewis,[2] completed the "Physician's Examination," affirming that he examined B.F. to determine whether he was mentally disabled pursuant to Section 302 and in need of immediate

---

[1] 50 P.S. § 7302.

[2] Dr. Lewis's first name is not in the record.

treatment. *Id.* at Part IV. Dr. Lewis stated on the form, "SI, intentional overdose, act of furtherance, 'good bye' text," and under the treatment needed section, he wrote, "inpatient." *Id.* Box "a" was checked to indicate: "The patient is severely mentally disabled within the meaning of Section 301 of the MHPA and in need of treatment, which shall begin immediately. He/she should be admitted to an approved facility for a period not to exceed 120 hours," pursuant to Section 302(d). *Id.* The Physician's Examination was completed between 12:00 a.m. and 1:00 a.m. on February 15, 2021. *See id.* at Part VI.[3] B.F. was referred to the Meadows Psychiatric Center for treatment, where he was admitted. He was discharged on February 17, 2021.

In March 2021, B.F. filed a petition for expungement of involuntary commitment under 18 Pa.C.S.A. § 6111.1(g) and restoration of civil rights under 18 Pa.C.S.A. § 6105(f)(1). The court held a hearing. B.F.'s treating psychiatrist Theresa Kurtz, M.D., testified that in July 2020, B.F. had been diagnosed with major depressive disorder and social anxiety, and, as of February 2021, he had been prescribed Seroquel. N.T., 5/27/21, at 14, 24. She said that at the time of the hearing, B.F.'s diagnosis remained the same, but he was not taking medication and his prognosis was very positive. *Id.* at 14-15, 17. The trial court limited Dr. Kurtz's testimony, ruling that it would consider Dr. Kurtz's testimony when determining whether B.F.'s right to

_____

[3] The exact time is written on the form, but the last two digits are not legible. The first two digits are "00."

possess firearms should be restored, but not when determining whether his Section 302 commitment should be expunged. *Id.* at 7.

The trial court denied B.F.'s petition to expunge, finding sufficient evidence supported the commitment. The trial court restored his right to possess firearms. B.F. appealed.

B.F. raises the following issues on appeal:

> I. Whether the Court erred in finding that [B.F.'s] ingestion of a non-lethal dose of medication was overt act in furtherance of suicide?
>
> II. Whether the Court erred in limiting the testimony of [B.F.'s] psychiatrist at the expungement hearing, even though she had spoken to the committing physician prior to the commitment and was able to testify regarding facts which were or should have been relied upon in his findings?
>
> III. Whether the Court erred in denying the petition for expungement by failing to consider the procedural and factual errors made during the commitment process and are evident from the petition?

B.F.'s Br. at 4. Both the Pennsylvania State Police and the Centre County Center for Mental Health filed responsive appellate briefs.

B.F. notes that Hopple's statement indicated B.F. sent his mother a goodbye text and took ten pills of Seroquel. He claims the "ingestion of a clearly non-lethal dose of medication cannot be considered an overt act in furtherance of suicide." *Id.* at 13. He argues that even if this Court finds the act of taking the Seroquel was such an act, there was no evidence of a threat to commit suicide within the preceding 30 days, claiming the text message to his mom was not a threat to commit suicide. He claims that although there

was a statement regarding treatment for depression and self-injurious behavior in the application, "there was no indication of a suicide threat within Hopple's narrative which would indicate a suicide threat on B.F.'s behalf." *Id.* at 11. B.F. attempts to distinguish this case from *In re L.M.P.*, 604 A.2d 712 (Pa.Super. 1992), reasoning that in that case the petitioner's brother attempted to stop him from overdosing on aspirin.

B.F.'s claim challenges the sufficiency of the evidence to support his Section 302 commitment. Such a challenge "presents a pure question of law," and our standard of review is *de novo*. *In re Vencil*, 152 A.3d 235, 241, 246 (Pa. 2017); *accord In re B.W.*, 250 A.3d 1163, 1170 (Pa. 2021).

A person committed under Section 302 may obtain expungement of the record of the commitment if the evidence was not sufficient to support the commitment:

> (2) A person who is involuntarily committed pursuant to section 302 of the Mental Health Procedures Act may petition the court to review the sufficiency of the evidence upon which the commitment was based. If the court determines that the evidence upon which the involuntary commitment was based was insufficient, the court shall order that the record of the commitment submitted to the Pennsylvania State Police be expunged. . . .

18 Pa.C.S.A. § 6111.1(g)(2) (footnote omitted).

The sufficiency analysis under Section 6111.1(g)(2) thus entails a determination of whether the evidence "contained in the contemporaneously-created record supports the conclusion that the individual required commitment under one (or more) of the specific, statutorily-defined

- 5 -

circumstances." ***In re Vencil***, 152 A.3d at 242 (comma omitted). The Pennsylvania Supreme Court has "emphasize[d] that the trial court's review is limited to the findings recorded by the physician and the information he or she relied upon in arriving at those findings." ***Id.*** at 246. Courts should "defer[] to the physician, as the original factfinder, as the physician examined and evaluated the individual in the first instance, was able to observe his or her demeanor, and has particularized training, knowledge and experience regarding whether a 302 commitment is medically necessary." ***Id.***

Section 302 of the MHPA provides that a person may be committed for emergency treatment and such treatment shall not exceed 120 hours where a physician determines the person is "severely mentally disabled." 50 P.S. § 7302(b), (d). "Severely mentally disabled" means the lessening, as a result of mental illness, of the "capacity to exercise self-control, judgment and discretion" in the conduct of one's "affairs and social relations," or to care for one's own personal needs to such a degree that the person "poses a clear and present danger of harm" to themselves or others "or the person is determined to be in need of assisted outpatient treatment[.]" ***Id.*** at § 7301(a). A person poses a clear and present danger of harm to themself where, among other things, within the past 30 days, the person "attempted suicide and . . . there is the reasonable probability of suicide unless adequate treatment is afforded[.]" ***Id.*** at § 7301(b)(2)(iii). "[A] clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide

and has committed acts which are in furtherance of the threat to commit suicide." *Id.* at § 7301(b)(2)(ii).

In *In re L.M.P.*, the Section 302 application for the appellant's minor son stated the son "[t]ook overdose of [aspirin]. Fought with brother when he tried to stop him. No stable environment for him to return to." 604 A.2d at 713. We concluded that there was sufficient evidence to support the commitment, noting that "[h]is action alone clearly satisfied the conditions of Section 302," and the doctors were of the opinion a stable home environment was needed to be released, and such a home environment did not exist. *Id.* at 714.

Here, the evidence supported the physician's determination that B.F. was severely mentally disabled and in need of involuntary commitment. He took 10 pills of Seroquel, more than his prescribed dose, and texted his mother, "sorry mom goodbye." Such evidence established that within the preceding 30 days he had attempted suicide and committed acts in furtherance of a threat to commit suicide such that he presented a clear and present danger to himself. *See id.* That the dosage taken was allegedly (and thankfully) "non-lethal," does not alter the analysis. Rather, the facts—his overdose on the medication, the "good-bye" text he sent his mother, and that he lived alone—supported the physician's determination.

B.F. next contends the court erred in refusing to permit his treating psychiatrist to testify to facts that he contends would be relevant to the sufficiency analysis. He maintains that the court should have permitted Dr.

Kurtz to testify regarding the sufficiency analysis because she had contact with B.F. while he was in the hospital and she had spoken with, and allegedly provided her opinion to, the treating physician on the night B.F. was admitted. B.F. argues the testimony would have been "relevant to the question of whether B.F. was severely mentally ill, whether his commitment continued to be necessary at the time of the commitment, and would have been among the information available to and considered by the physician at the time of the commitment." B.F.'s Br. at 14. He claims it was relevant evidence and available to the original decision maker. *Id.*

The court did not abuse its discretion in not admitting the doctor's testimony regarding conversations that took place the evening B.F. was admitted. The conversations were not part of the physician's record, and therefore should not be considered when addressing the sufficiency of the evidence.[4] *In re Vencil*, 152 A.3d at 242.

In his last issue, B.F. claims the application included inaccurate findings and information including the allegation B.F. "was unable to satisfy his/her need for nourishment, personal or medical care, shelter or self-protection and safety; the request for a warrant; issuance of a warrant and the allegation within the physician's examination that he had been brought to the hospital

---

[4] Further, even if the psychiatrist told the physician that she did not think B.F. should be committed, the record would still support the physician's conclusion. The physician was in the room with B.F., who had overdosed on Seroquel and sent his mother a text saying good bye and he was sorry. That someone may have arrived at a different conclusion than the physician does not change that the facts supported the commitment.

pursuant to a mental health warrant." B.F.'s Br. at 16. He notes the physician affirmed that B.F. had been brought to the hospital on a warrant. He alleges this was inaccurate and "shows the physician was either unaware of B.F.'s circumstances, or completed the form carelessly or negligently." *Id.* at 17. He further claims he was not examined within two hours of arriving to the hospital, as required. He argues the court failed to address these errors, and claims they were more than technical errors. He contends that "[b]ecause involuntary commitment implicates a significant liberty interest and entails lifelong consequences, the procedural requirements enumerated in the Act must be strictly construed." *Id.* at 15 (citations omitted).

Here, B.F. filed a petition to expunge his mental health record under 18 Pa.C.S.A. § 6111.1(g)(2) and restoration his civil rights under 18 Pa.C.S.A. § 6105(f)(1). The first claim in the petition was for expungement of involuntary commitment under 18 Pa.C.S. § 6111.1(g). That claim included allegations that the evidence was insufficient to support the commitment. It further included an allegation that B.F.'s examination by a physician occurred more than two hours after his arrival at the hospital, which was "unlawful procedurally," and, "[g]iven the significant property and liberty interests involved, the deficiencies and/or inaccuracies in the petition and order for involuntary commitment" entitle him to expungement of the record. Pet. for Expungement at ¶ 14.

Section 6111.1(g)(2) does not allow expungement based on alleged procedural irregularities. Rather, it requires expungement only if the evidence

was insufficient to support the finding. ***See In re Vencil***, 152 A.3d at 245

(explaining that Section 6111.1(g)(2) only affords a mechanism to expunge

the record of an individual's Section 302 commitment for insufficient

evidence). This claim was not a basis on which B.F. could obtain expungement.

Furthermore, even if such a claim could be a basis on which to obtain

expungement,[5] B.F.'s claim that the physician failed to examine him within

two hours[6] fails. Although B.F. arrived at the hospital at 6:10 p.m. on February

_____

[5] ***See In re A.J.N.***, 144 A.3d 130, 135 (Pa.Super. 2016) (finding appellant entitled to expungement of his Section 302 commitment where a violation of his due process rights occurred because "the requirements of § 302(a) were violated in that police, when they assumed custody of Appellant and drove him to the mental health facilities, had neither personally viewed behavior supporting a belief that Appellant was in need of involuntary treatment nor had a warrant been issued").

[6] Section 302(b) provides:

> **(b) Examination and Determination of Need for Emergency Treatment.--**A person taken to a facility shall be examined by a physician within two hours of arrival in order to determine if the person is severely mentally disabled within the meaning of section 301(b) and in need of immediate treatment. If it is determined that the person is severely mentally disabled and in need of emergency treatment, treatment shall be begun immediately. If the physician does not so find, or if at any time it appears there is no longer a need for immediate treatment, the person shall be discharged and returned to such place as he may reasonably direct. The physician shall make a record of the examination and his findings. In no event shall a person be accepted for involuntary emergency treatment if a previous application was granted for such treatment and the new application is not based on behavior occurring after the earlier application.

50 P.S. § 7302(b) (footnote omitted).

14, 2021, that was not the time that the two-hour window began. Rather, the two-hour window began when the Section 302 warrant was authorized, which was at some point after 11:00 p.m.[7] *See **In re T.B.**,* 113 A.3d 1273, 1277 (Pa.Super. 2015). Therefore, his examination by a physician between 12:00 a.m. and 1:00 a.m. on February 15, 2021, did not violate the statute.[8]

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/29/2022

---

[7] The Physician's Examination portion of the Section 302 Application stated that B.F. arrived at the facility at 6:10 p.m. on February 14, 2021, and was examined at 11:00 p.m. However, to determine whether the time requirements of the MHPA were satisfied, we calculate the time from the issuance of the warrant, not the time from arrival to the hospital. ***In re T.B.**,* 113 A.3d 1273, 1277 (Pa.Super. 2015) (concluding that where a petitioner voluntarily went to a hospital, the time of arrival for purposes of the MHPA is when the Section 302 warrant is authorized).

[8] B.F. has waived any other claim based on alleged procedural errors, as the only potential Due Process claim mentioned in the Petition for Expungement was based on the time frame of his commitment.

- 11 -